Oral argument, not to exceed 15 minutes per side, and Mr. Desi for the Appellant Cross Appellee Number. Mr. Desi, is that correct? Mr. Desi. Mr. Desi, okay. Like Desi Arnaz. Okay, I got it. Sorry. No problem. Thank you, Your Honors. Good morning. May it please the Court, it's nice to see you all actually in person after what seems like a long break from oral arguments. Your Honors, I'm here representing the Appellant Felicia Morgan. This is a case of a failure to protect and a deliberate indifference. My client was housed at the Wayne County Jail. She was suffering from severe mental illness, debilitating mental illness at the time. She was then transferred to a private hospital that had contracted with the county to provide mental health services for the most acute inmates who were suffering from mental health issues, such as schizophrenia, paranoia, whatnot, what have you. While at this contracted hospital, my client was sexually assaulted by another male inmate, which gives rise to the instant claims. Basically, the issue about qualified immunity, I'd like to just go straight to that point first. The district court, when it dismissed this action, it pointed out certain facts and said that these individual deputy defendants were not entitled to qualified immunity. And then the district court went on to then grant qualified immunity, saying that they were not aware of any facts. So there's an inconsistency within the opinion that I don't believe can be recognized. Are you appealing qualified immunity as to all three deputies? Because I didn't see any argument as to Pendergrass. I'm appealing only as to the Monell claim as to Sergeant Pendergrass, but not the qualified immunity as to her individually. Okay. All right. But as the Monell claim, there's facts that relate to Sergeant Pendergrass. So, your honors, as far as the qualified immunity, I just want to point out, this is what the court said. Clark was subjectively aware that Miles was sexually preoccupied, and the layout of the ward increased the risk of abuse without observation. That's from the district court's opinion. That's record entry 85. That's page I. What's the evidence in the record that supports that? So the evidence is from the two deputies, so we'll start with Deputy Clark. Deputy Clark admitted that, one, my client's attacker, Mr. Miles, was, quote, sexually preoccupied. That was documented in the record in her notes. What does sexually preoccupied mean? Well, there's another. Sure. Well, it obviously means that he had some level of fixation on the women, whether it be staff or inmates or guards. There was another employee who testified, Mr. Glenn Williams. And Mr. Glenn Williams also testified that this particular inmate would also look to women and for females for sexual gratification. So this was well known that my client's attacker had these particular characteristics. Now, you couple that with the fact that my client was 5'3", she was 140 pounds or so, 135, 140 pounds. Her attacker is 6' tall. He weighs 280 pounds. And he's known to have not only the sexual preoccupation, but he's also known to have other violent propensities that were exhibited only in the weeks before the particular attack. So, for instance, the district court said, well, there's no record evidence of him having any violent propensities, but there is. It's in the record. He was cited for fashioning a weapon, and he was booked into the jail for assaulting a police officer. So there was a history that this particular person had a background of violent propensities. Now, under this court's decision in Green v. Bowles, this court said there's basically two ways that you can proceed on this theory. Either that you can show that the person who was the attacker was known to have certain characteristics, and if you put him in a population at large, he could cause a problem for an individual. Or you can also show on the flip side that the person who was attacked, in this case Miss Morgan, was susceptible to some sort of abuse because of her vulnerable characteristics. I believe we have both of that in this case. Both my client suffering from debilitating mental health issues at the time. She didn't even know where she was. She didn't know what had happened. She wasn't even aware that she had been sexually assaulted. She didn't understand that she had become pregnant as a result of the sexual assault when she was interviewed. Wayne County had interviewed her. There's a recording of that interview, and if you listen to the recording of that interview by the detective, Clara Steele, you'll see that that recording varies greatly from her written statements. Her written statements that she interviewed Miss Morgan, and she said this and she said that. But if you listen to the recording, you'll hear that Miss Morgan doesn't even know what she's talking about. She says, were you at this facility? She says, I don't know. Is that where I was? You tell me. Do you have a record of it? Are you talking about the objective component of deliberate indifference right now as opposed to the subjective component? Well, I was sort of just, I sort of moved over to the issue of whether my client was aware of the facts. But as far as the objective. You started out with qualified immunity. Sure. And qualified immunity, you concede here because your client was a convicted prisoner that the Eighth Amendment standard applies, which requires both subjective and objective. I agree with that, yes. Okay. And the problem here may not be the objective component, but the subjective component. And I guess I want to know what evidence you have to establish that Defendants Clark and Davis had the subjective knowledge. Sure. Required to defeat qualified immunity, and you admit it's your burden to defeat the qualified immunity once it's raised. Of course, Your Honor. I agree with that. So as the District Court pointed out, Clark was subjectively aware that Miles was sexually preoccupied and the layout of the ward increased the risk of abuse without observation. So Deputy Clark and Davis both acknowledged and admitted that it was imperative and necessary to have at least two deputies in the ward at all times because there were blind spots. Everyone agreed and admitted and readily acknowledged that there were blind spots in the ward such that they had to watch. So they admitted they knew they had to watch. Why? Because it was a security risk, and they knew that the men and women were co-ed housed in a facility, which to me makes very little sense that you would take inmates from a general population from the jail, just bring them over, put them in a co-ed facility. No locks, no division, no doors between the men and the women. So they're literally just intermingled where they are. So back to your point about what's the evidence. They admitted they needed to be on the ward at least two. So what happens? The third officer goes to lunch. That's Hunter. And then Davis goes to the restroom, which is outside of the ward. So now we're down to one deputy, Deputy Clark. Deputy Clark admitted she was sitting at the front desk. She admitted that you cannot see the hallways from the front desk and that you would not be able to see if an inmate was wandering, had gone from one hall to the next. She admitted you would not be able to see that. And she admitted that someone should have been in the back day room where they could see the views of the hallways at all times. So both Clark and Davis knew that the physical layout of the building increased the risk, which is what the district court pointed out. You know, what you just described to me sounds at most like negligence. Well, Your Honor, I would disagree. In this court's opinion in Bishop, in which Your Honor was on that panel, Bishop involved very similar facts, that this court recognized that there were two theories in that case that allowed for qualified immunity to be defeated. And those two theories were that the physical structure of the facility could give rise to an increased risk. And, of course, in Bishop the facility was different, but in this case we have certain characteristics of the facility that give rise to that. Well, that goes to a knowledge on the part of deputies, but it really doesn't go necessarily to the issue of deliberate indifference. Well, I think... Because it really, I mean, it affects their knowledge, but it doesn't necessarily affect their state of mind. Well, I think it can, Your Honor, because if they know that they have to watch the particular layout of the facility because they know that there are security risks, then I think that that can then go to the deliberate indifference. And they admitted here that we know we had to watch these. And there was another... There's also some evidence about some of the employees of the facility, while not there in a security capacity, also being present enough to give some knowledge of what was going on. So the district court, I believe it was on the reconsideration after Judge Botanied issued the original decision, that there was some discussion about how the employees of the hospital would also be there to sort of coordinate. But the officers testified, and this is in the record, and it's cited in my brief, the officers testified that there was no coordination between those employees and that they did not coordinate rounds. They did not know if they were there.  That's correct, Your Honor. And Deputy Clark and Deputy Davis also had testified and acknowledged that they didn't know. They just assumed someone would have been back there, but there wasn't anybody back there at the time that Davis left the ward. So again, Davis leaves the ward, you're down now to having one deputy who's on the front at the desk who can't see anything. So, I mean, those are essentially the arguments. But there was an assumption on the part of the deputy at the desk that there was somebody back there. Doesn't that go to the subjective state of mind? Well, I think it could. But at the same time, without them having any knowledge or any actual coordination, I think that that assumption could also lead to deliberate indifference because what you're saying is, well, we don't know. We just assume maybe someone was back there. And that employee from the – Sure sounds like negligence, but I'm really struggling to notch that up to the next level. Well, I think where it gets to the next level, Your Honor, is that, one, this is a facility that's co-ed housing between both men and women. So there's literally just – they can be roomed at any point in this small facility next to each other, across from each other. So the fact that they're already co-ed housing increases that risk. And by them then just assuming that someone might be there if the other two leave – I mean, the Wayne County policies are that two deputies had to stay in the facility at all times. I see that my time is up. I didn't reserve – this is a cross-appeal. I did not reserve five minutes. It looks like I started at 10. I don't know if – We have four minutes for rebuttal. Oh, you did have four minutes for rebuttal. All right. Then I will reserve my four minutes for rebuttal, unless you have any other questions for me at this point. All right. Thank you, Your Honors. All right. Mr. Stella. Don't reset the time. Good morning. May it please the Court, my name is Davide Stella, and I'm an attorney representing Deputy Clark, Deputy Davis, Sergeant Pendergrass, and Wayne County. Thank you. On the first issue, I wanted to – I raised this in our briefing, but there is a cross-appeal in this case on the statute of limitations that had expired. And I was not quite sure from the Court's prior precedent whether if the judgment's in favor of defendants on qualified immunity and lack of a genuine issue of material fact on a Monell claim, whether we would have to cross-appeal the denial of the statute of limitations. So I just want to make clear that we did both in this case. So we raised it as an alternative. I understand that there's also a question – that there's also an issue on appeal about the statute of limitations. I don't think the statute of limitations is your strongest argument. I mean, you can spend your time on it, but if I were you, I'd move on to the – I understand, Your Honor. You know, I think statute of limitations is actually the clearer argument. I think that – All right. Well, okay, I tend to disagree with you. I think there's a question of fact as to her – insanity, I guess, is the word that they use, the tolling statute. And there's a lot of facts in dispute there. But you could argue a cross-appeal if you want, which I don't think was necessary, by the way. But you can argue that. But I'd rather have you rebut the qualified immunity. I would agree. The Monell and also the state law claims gave me pause of whether this arises from the care and treatment of the patient or not. And anyway. Of course, I can certainly address that. But I would just like to say, because I feel like I would not be doing my duty if I didn't point this out, that Ms. Morgan in 2013 wrote out an affidavit in her own handwriting. We know the facts. We really know the facts. So, Your Honor, we'll talk about the state law claim. I guess we want to start with that one. Michigan law provides broad governmental immunity for claims directly against the entities. We're talking about Wayne County. It is my understanding that there is no appeal on state law claims against the individual people in their individual capacity. So there is a medical care exception to Michigan's state law of governmental immunity that talks about whether the claim arises from providing medical care and treatment. So, unfortunately, we do not have a good Michigan case at this point, on this point. But our argument is that when deputies are at a private facility, so we're at a private hospital. We're not in a Wayne County facility. We're not in a place we control or own. We're just providing, you know. Would it be different if it were a Wayne County facility and these are Wayne County employees? I mean, would the result likely be different? As opposed to here, they're assigned to a private facility. And, I mean, your argument is that the private facility is in charge of the care and treatment and all they're doing is they're providing security for it. They're not having anything to do with it. It's not disputed they have nothing to do with the treatment. All right. But, okay. I guess we don't have to get into hypotheticals. But I think it would be a stronger case for them if it were a Wayne County facility and there were employees, the security guards were employees like everybody else, the doctors and nurses, everybody else. Your Honor, I would agree. I would agree that it would be a stronger claim. But, again, this is a claim against the county. So the claim would have to, you know, I would say that the claim would still have to do with, I mean, it's kind of analogous in my mind to the medical malpractice claim. You mistreated somebody and the government can't get out of mistreating you medically. And so in terms of providing But the Court of Appeals decisions say it's not limited to malpractice, right? Well That the care and treatment exception is not limited to malpractice. It's broader than that. Yeah, I mean, those cases are a little confusing because those taught me, often in Michigan law there's a, in medical malpractice, there's a dispute between ordinary negligence and medical malpractice because medical malpractice requires all sorts of pre-suit notifications and experts and things like that. So a lot of people are arguing that the governmental immunity is coterminous with medical malpractice, so you have to file those pre-stuff. It's all very complicated, but I think that at the end of the day, Michigan has not signaled that the security part of a medical facility falls within that umbrella. So it may be an open question in Michigan, but we don't have, all we have is a few district court decisions from our district that have held that deputies are not providing medical care when the claim is for failure to provide medical care. So it's a little bit of an obtuse issue, but I would admit, but I would say the extent that the claims here relate to a claim of sexual assault that has nothing to do with any medical care that the deputies were providing or anything Wayne County was doing at that time. But your Honor, on the facts, I think it's important to recognize in this case,  and we're not going to spend our time talking about that, but at the time this occurred, in November 2005, so we're talking about 12 years before the suit was filed, 17 years ago as we sit here today, is that Ms. Morgan was found in Mr. Miles' room. He didn't travel to her room, she was in his room. So we would assume that Ms. Morgan traveled from her room, because the testimony is that Ms. Morgan was in her room. She asked the hospital worker for some towels or toilet paper or something like that. The hospital worker goes around the circular ward. Of course, we don't know what it looks like because the hospital is gone and gutted. We have no idea what it physically looked like in real life. But the hospital worker gets the toilet paper, comes back to Ms. Morgan's room, and says, where is she? She's not here. It seems to me that while there's significant evidence at the time of this happening that might suggest it was a consensual encounter, there's also later evidence that suggests it was not. So the nature of the encounter, I think it's more productive to focus on the officer's state of knowledge than the nature of this encounter. Well, for sure. I think that it's important to point that out. I think this bears on that issue because at the time this occurred, this was reported as consensual. I understand that. But that kind of influences how people think about this for the next decade. So no one at Wayne County or United Community Hospital is aware that anybody is claiming this was anything other than consensual. So it's eight years later that the first time this allegation is made. And by this time, the hospital is gone. The hospital had a rape kit presented to her that she refused to do. I assume they wouldn't take her to the hospital and ask for a rape kit if they thought it was all consensual, would they? Well, no. They would take her there anyway. The record says that that's a precaution, that she didn't want to do it. And they took her anyway. And she refused the kit at the hospital. Was it standard procedure to take someone who had been involved in a sexual encounter in the hospital to the hospital? Yes, it was standard procedure. So she refused to do it. She met with Dr. Roy Allrott. You've only got seven minutes here. I think the critical issue is the subjective component of deliberate indifference as to defendants Davis and Clark. And I guess I'd like to know from you why you don't think they've established the subjective component as to themselves. Okay. So if we're talking about an Eighth Amendment deliberate indifference, that's what the subjective and subjective components are. That's what they admit we are, yeah. So the idea is that I would say that neither prong is established, right? Like, the idea that – I think the objective component is pretty close, but I have questions about the subjective component. The idea is that there might be a good argument that there would be an objective problem if there had been any prior incidents ever, ever in the hospital, okay? There is no incidence of prior improper male-female interactions. There is no incidence of males and females being in each other's rooms. There was no complaints about Mr. Miles. All three, the two deputies who were there and the hospital worker, we were able to find. And, of course, the passage of time has made it very difficult to find. Mr. Miles has a propensity of violence. He didn't say sexual violence, but violence. Well, that's a characteristic that a lot of people who are incarcerated would be. So if we said that everybody who has a violent past is now – anything that that person does is now a satisfied subjective component, we would look to – so the deputies themselves don't know the criminal charges against these people, right? So they were not aware. They didn't establish their knowledge of the – Yeah, they testified that they were generally not aware of what anybody was in there for. Because as sheriff's deputies, we run a jail and we provide security. We don't prosecute these people for the underlying offenses. So oftentimes the deputies have no idea why somebody is in unless they would ask, right? So then Miles was accused of assaulting or resisting, obstructing, but there's nothing in the record about what that incident was. Was he getting handcuffed and he didn't want to get handcuffed? Or he had disobeyed an order? So we don't have anything in the record of what Miles actually did with this police officer. Did he punch him? Did he, you know, did he disobey verbal commands? And so – but whatever the answer to that question is, the deputies were not aware of it. All the deputies know is how Miles is acting at that facility, right? And the testimony – and Mr. Glenn Williams, again, is the only hospital worker we're able to track down because all the records from the hospital are gone. They've been destroyed. We have no idea. There was an allegation of his sexual – I can't even remember how he characterized it, but the guy was like a sexual animal or something. Nobody said that. Nobody said that. I mean, what Mr. Williams said, I think, or Deputy Davis said, is that Mr. Miles was a friendly guy, outgoing guy, right? And he was very chatty with people, right? And the idea is that's what the hospital, not William County, but what the hospital did is the hospital allowed the male and female inmates, or patients rather, they would consider them patients, to be – and there's an activity room that they're allowed to watch TV and play games. And so in that time, you actually do have a chance for males and females to interact. And there was some testimony that Miles and Felicia were very friendly, you know, in those situations, right? But to think that there would be a scenario that – So the idea is that Mr. Davis left the ward to use the bathroom, right? There are three other hospital workers in that circular ward. Ms. Morgan had a direct interaction with Mr. Williams and sent him on an errand that sent him some other way, you know, that allowed this travel from her – because we know she was in her room and then she's discovered having sex with him in his room. These are on opposite sides of an oval hall. So we know that she went there after she sent the hospital worker out to go to the supply closet the other way to get something. So the idea is that this Mr. – Leonard Davis, who's using the bathroom, whose location is closer than the bathroom is outside this courtroom, you know? So it's just outside. So he goes to the bathroom and in that moment, you know, Ms. Morgan somehow makes it from her room to Mr. Miles' room, right? And the idea is that – did anybody know that that was what's going to happen, right? And the testimony is it was a quiet ward with no incidents, no inappropriate interactions. Miles hadn't caused a problem. Nobody complained about Miles. And this is not just the deputies saying this. This is – the hospital worker said that as well. He could not see this coming. You know, no one said they saw this coming. And then, you know, we're in a weird situation because, you know, this was never reported as an assault at the time. So when they respond to it and they try to get to the bottom of it, it looked like the people that they had tried to get away with something. You know, that's what it appeared to everyone is. So that changes the tenor of all this. That they're like, whoa, wait a minute. Everybody's conclusion is, well, they kind of got away with it. You know, they tried to, like, move around the ward when no one was looking. So like I said, that really informs how people kind of look at all this, right? And then this allegation of assault doesn't come until eight years later in an affidavit that Ms. Morgan wrote in support of another lawsuit. So, like I said, I think that the argument that this ward was so dangerous that anything that occurred, if you spent one second and stepped away, that the deputies are automatically liable for anything that would have happened amongst the inmates, would kind of just swallow up the subjective problem. We really need the knowledge. And the idea is, again, in retrospect, we can say that, well, maybe we would have seen this coming, you know, if we'd put the pieces together. But the idea is that no one knew Miles was a threat. No one complained about him. Ms. Morgan certainly hadn't, right? And Mr. Miles had behaved himself perfectly on the ward. And he only could be faulted with being chatty, friendly, and a little bit too friendly with the female staff and inmates. Flirty. You know, that's not a... Flirty, I think was the word, wasn't it? Excuse me? Flirty. Yeah. Like I said, we asked Mr. Glenn Williams about that, who was the only hospital worker we could track down. Again, no records, nothing. So we can't even reconstruct from the hospital's end what they thought about this. And he said, you know, he was a nice guy, very chatty, but I would never have expected that he would hurt anybody. So, like I said, at best... And again, you know, unfortunately in this circumstance, you know, we've actually had two district court judges, different judges look at this, right? So with the unfortunate and untimely death of Judge Botani, this case was reassigned to Judge Cleland. These arguments were made to Judge Cleland. He also took a second look at all this, and he said, I don't see anything wrong with how Judge Botani resolved this. So it wasn't just one set of eyes on this case, there was two. So unless the court has any further questions, we would ask that you would affirm the judgment on the qualified immunity, or on the alternative, find its statute of limitations part of this case. Okay, thank you. Thank you. Thank you, Your Honors. I want to just correct a few things. First, I don't believe my client was found having sex with Mr. Miles. He was found on top of her. So for what that's worth, I don't think it's accurate to characterize that as having sex with him. He was found on top of her. And again, she didn't even recall the event. Well, she later said she didn't recall the event. That's what we know. At noon. We also have the evidence of her conduct at the time of the event. So I mean, there's lots of different evidence that's on the record. Sure, there's various. There's certainly various facts. I want to answer, Judge Griffin, your question about Mr. Davis and whether he had known about any prior assaultive behavior. He did admit and testify in his deposition that these inmates did exhibit assaultive behaviors and that there had also been fights between where inmates had attacked doctors. So that's in the record. Okay, but none of them were sexual in nature? No, they weren't sexual in nature. But Mr. Glenn Williams testified that the inmates would try to avoid detection for the purpose of trying to engage in sexual activity and that he knew it was important to actually watch in the back because that would happen. And Mr. Williams also described the attacker in this case as looking for sexual gratification from women. So your question, you asked my brother counsel how I described it. What was written in the records by Deputy Clark was that Mr. Miles was sexually preoccupied, quote-unquote, sexually preoccupied. And Mr. Williams testified that the attacker sought sexual gratification from women. So that's what's in the record evidence. And that's Mr. Davis' testimony. I also want to address, I'm sorry, Judge, you have a question. Well, I mean, Mr. Williams is the hospital employee who could be tracked down after the fact, right? Yes. And you have what he said, but you also have what the officers said about their state of knowledge and information at the time this actually occurred. Sure. And the only reason I'm citing your honors to Mr. Williams' testimony is because it seems that that testimony, and it certainly provides the basis to say that there were, it was well known that the inmates had been at times looking to engage in sexual activity. Was Mr. Williams' employment, did it go on during the time that this incident occurred? Yes. Okay. Was he familiar with the officers in question? I think he was familiar with them generally. I can't remember specifically what his detailed knowledge of them, but I believe he had knowledge of them. Regardless of what he knew or said he knew, he can't testify as to what they knew. No, no, I agree with that. I'm only using that, I'm only using his testimony to provide a basis to show you that this was common knowledge. Well, I don't, I don't, I think you're, I think you're trying to get a little bit too much out of that testimony. All right, all right, that's fair. If I could, I'd like, I only have a minute left. I want to discuss the state law claims Judge Griffin raised. My brother counsel said I'm not appealing the state law claims against individual defendants. I am, it's stated clearly in my brief. It's actually highlighted and underlined that we're seeking a remand on the state law claims against both the county and the individual defendants for the governmental immunity exception. I'd also draw the court's attention to the cases that I've cited, which is the Esteta-Filarski case, which is the most recent from the Michigan Court of Appeals, that says the medical care and treatment exception applies when there are facts relating to medical care. The district court pointed out that the defendant was not contesting that my client was a patient at the time of the event. So I believe that her claims fall squarely within that exception on the governmental immunity exception for the medical care and treatment under those cases that were cited. The case relied on the district, by the district court, was a federal court case, which I don't believe carries any weight in interpreting Michigan law in the governmental immunity exception. So unless you have any questions, I see my time is up. We thank you both very much for your argument. And we'll consider the case carefully. Thank you.